Mario Pittoni, J.
The owner and the contract-vendees of realty sue for a judgment declaring invalid the October 16, 1964 amendment to the Building Zone Ordinance of the Village of Bayville which up-zoned the property from 15,000 square feet to 40,000 square feet as the minimum requirement for residential plots. Plaintiffs claim that the amendment is invalid because is confiscates the property without just compensation, it was not enacted in accordance with a comprehensive plan, and it was not designed to further any of the purposes for which zoning ordinances may be enacted.
The facts are not in dispute.
*606 The subject property consists of some 60 acres-of land on a high plateau abutting- Long Island Sound. It has a frontage on Bayville Avenue of 1,885 feet, a depth along its easterly boundary of 845 feet, a frontage along Long Island Sound of 2,550 feet, and a depth along its westerly boundary of 1,595 feet. Except for the northwest corner and the sharp drop from the pleateau to the shore line, the topography is substantially level. The property is partially treed, and at one time was extensively landscaped.
Along the Bayville Avenue frontage is a brick wall 12 inches thick which ranges in height from 6 to 12 feet. The county’s proposed widening of Bayville Avenue would remove this wall.
Physically, the property is adaptable to subdivision and construction of single-family residences. Both sides agreed that such use would be the highest and best use of the subject property. Both sides also agreed that, except for the sea wall, the existing improvements on the subject property were of no value for such purposes, whether development be carried out on 15,000 or 40,000 square-foot plots.
Bayville Avenue, which forms the southerly boundary of the subject property, is a county road subject to heavy traffic. Even in the Winter months, the daily traffic amounts to approximately 5,000 cars. In the Summer months, when the population of the village is swelled by its Summer residents, Bayville Avenue is also burdened with the additional traffic from people seeking the town beaches at both ends of the village. In the Summer the daily count is approximately 10,000.
Plaintiff Bismark acquired the subject property from her former husband, Harrison Williams, now deceased. Through his corporation, he had purchased the subject lot in 1926 for $750,000. Shortly thereafter, he purchased other property in the vicinity and south of Bayville Avenue, and constructed on this complex a substantial estate in which his total investment ran to approximately $3,750,000.
In 1951, the entire estate was transferred to plaintiff Bismark, who, two years later, donated to the village the 34 acres south of Bayville Avenue including the buildings thereon. Part of this property is now the Village Park (east of School Street and north of Godfrey Avenue); another part is the site of the village offices (west of School Street and north of Godfrey Avenue).
The principal mansion which had been erected on the subject lot was demolished in 1950 or 1951. Plaintiff Bismark moved away from the property in 1955 and placed it on the market for sale in 1957, having listed it with J. Edward Brewer for *607 $1,250,000. Up to 1960, there were a number of offers around a million dollars. Between 1960 and 1963 several other offers were received in excess of $1,250,000. Plaintiff Bismark finally, on February 7,1964, executed a contract of sale with the plaintiff contract vendees for $1,450,000.
The purchase price of the subject property in 1926 was $750,000. However, let us first take the property as of January 3, 1957, after the demolition of the main house and when the property was first placed on the market. At least $200,000 in taxes have been paid on the property since January 1, 1957, so that at the present time the absolute minimum cost of the property is $950,000.
It has been established that the property under the 40,000 square-foot zoning restriction is worth $540,500, whereas if valued pursuant to the 15,000 square-foot zoning restriction the property is worth $1,297,875. Thus, the up-zoning amendment has reduced the value of the property from $1,297,875 to $540,500, or a reduction of $757,375. Clearly, therefore, the $540,500 valuation pursuant to the zoning amendment, which requires a 40,000 square-foot minimum, is not only far less than the original purchase price of $750,000 in 1926, but there is an even greater difference when compared to the purchase price and taxes paid of $950,000.
When the subject property was originally purchased by Harrison Williams, there was no zoning ordinance in the village. In 1927, the first zoning ordinance classified the subject property, along with virtually all the remainder of the village, for 4.000 square-foot residential development. In 1954, the village up-zoned the subject property together with a substantial area of property north of Bayville Avenue, to 7,500 square-foot residential. Then, in 1959, the village again up-zoned the subject property to 15,000 square feet. Finally, after two unsuccessful attempts, the village, on October 16, 1964, adopted a procedurally valid amendment which increased the area restriction to 40.000 square feet.
Let us look at the zoning pattern of the surrounding area. To the east of the property, the area is zoned for 5,000 square feet. To the south, most of the area is zoned for either 5,000 square feet or 7,500 square feet. A long strip, from Bayville Avenue on the north to Mill Neck Creek on the south, is zoned for 20,000 square feet, but most of that area is now used for municipal, school and church uses, and the rest is undeveloped. To the southwest, the area is zoned mostly for 5,000 square feet with some at 7,500. To the immediate west, after the disputed rezoning, 5 plots are now zoned 40,000 square-foot minimum, *608 and still farther to the west, past these 5 plots, the zoning is 15.000 square feet.
Except for the municipal, school and church uses, most of the land to the east, south and southwest of the property has been developed on plots of less than 15,000 square feet. As for the 5 plots immediately to the west of the subject property, these plots, which are now zoned for a minimum of 40,000 square feet, have residences that were constructed before 1949 and are between 50 and 75 years old. The area farther west, now zoned for 15,000 square feet, is partly developed and partly undeveloped.
There are many villages on the north shore of Long Island which are restricted to low-density, single-family residential developments on minimum plots of one or more acres, but, unlike these other north shore villages, Bayville is one of the most densely populated areas in Nassau County. Until 1954, the largest minimum plot size required in the village was 5,000 square feet, and until 1963 the requirement was 15,000 square feet.
In the area involved, 1,253 residences have been erected. Of these, 594 are on plots less than 7,500 square feet, 508 on plots less than 15,000 square feet, 62 on plots less than 20,000 square feet, and only 28 are on plots of 40,000 square feet or more. Twenty-five of these 28 were erected prior to 1949, 2 between 1955 and 1959, and only 1 in the last year.
In the past 11 years, 456 homes have been built on plots of less than 20,000 square feet, only 3 have been built on plots of 40.000 square feet or more, and only 1 of these was built between 1960 and 1965. This shows neither a need nor a demand for homes on 40,000 square-foot plots in this area. Furthermore, Bayville is a community where the income level is 89th out of 94 communities in Nassau County. These factors corroborate Baker’s testimony that it would take about 20 years to develop and sell residences on 40,000 square-foot plots in this area.
Against this, defendant’s expert, De Costerd, by strained reasoning, said that residences in 40,000 square-foot plots in the area could be developed and sold within three to four years. To do this, he said, you would need aggressive marketing, hire the best agents in the East, even better than he was, advertise in exclusive papers, and go after customers, all at a cost of $75,000 to $100,000 for promotion and advertising. He failed to point out that any other developers had ever gone or had to go to such extremes to protect their investments. De Costerd’s testimony was strained rationalization which weakened the impact of his opinion and compels me to reject it and to *609 accept Baker’s opinion that it would take approximately 20 years to properly develop the property pursuant to 40,000 square-foot zoning.
As previously stated, the 1964 up-zoning ordinance has diminished the property’s value to $540,500, or to about 42% of its actual value, and to a value far less than its actual cost of $750,000 in 1926 or its total out-of-pocket cost, up to now, of $950,000 to plaintiff Bismark.
I am aware of the Levitt v. Village of Sands Point case (6 N Y 2d 269, 273) where the court said that mere lessening of profits or economic loss to a property owner does not render a zoning ordinance unconstitutional, but that case also recognized the unconstitutionality of an ordinance that precluded the use of the property for any purpose for which it is adapted. So that, when a residential zoning ordinance, without sufficient reason, devaluates property to an unreasonable degree, as in this case, to 42% of its actual value and to far below its actual cost, and makes it impossible to reasonably develop the property with a fair return in less than 20 years, that, ordinance is so unreasonable and so arbitrary as to constitute an unconstitutional invasion of plaintiff’s property rights.
The village has no express or recorded comprehensive plan. At the time of the trial, it had not yet adopted a proposed “Village Development Plan,” which is dated July, 1965, nine months after the amendment in issue and two years after the original attempted up-zoning.
Perhaps a comprehensive plan can be spelled out or determined from the zoning history of the village and from the actual development of the village since the first zoning ordinance in 1927. If that be the case, from 1927 to 1959 the village plan contemplated and permitted residential developments of plots of 15,000 square feet or less. As recently as 1959, the village completed a four-year comprehensive zoning study and determined that the maximum plot size in the village should be 15,000 square feet.
On that basis, the up-zoning to 40,000 square feet was not in accordance with, but in violation of, the village’s comprehensive plan. The up-zoning to 40,000 square feet nearly tripled the minimum area requirement for the area and the village. The attempt to up-zone the area to 40,000 square feet was in violation of the prior zoning plan and was not pursuant to or in reliance upon the unadopted plan now offered by the village’s expert, Clark. Apparently, Clark Avas retained to justify the village’s prior determination that it was going to up-zone plaintiff’s property.
*610 The up-zoning of the plaintiff’s property creates instability and irregularity and violates the uniformity of the zoning pattern. Plaintiff’s property, in 10 years, has been up-zoned from 4,000 square feet to 7,500 to 15,000 and now to 40,000 square feet. A landowner such as the plaintiff cannot safely plan the use and development of his property. He does not know what whim or caprice by the village will interfere with his development or sale of property, as happened in this case.
To all this the village says: “ The test * * * is simply that of balance. The balance between the property right (which in its present form is the right to unlimited and unrestricted use of real estate) against the general welfare of the community.” The village first says its plan is to diversify the types of residential environment. But it cannot do so at this late date at the expense of the plaintiff’s property value by singling out plaintiff’s property for such purpose. The village wants to create an'island of a few residential estates on 40,000 square-foot plots, at plaintiff’s expense, in a village where the income level is 89th out of 94 in Nassau County and where there are over 1,250 homes, half of them on plots less than 7,500 square feet and the other half mostly on plots of less than 15,000 square feet. This is a clear case of whim and caprice.
But, says the village, aesthetics alone can justify the enactment and cites People v. Stover (12 N Y 2d 642). However, that case involved a prosecution for violating an ordinance which prohibited clotheslines near a street. It did not deprive the owner of reasonable use of his property, only unreasonable use to the detriment of other landowners. Aesthetic purposes were not used to reduce anyone’s property value by 58%, as here. If anything, Stover’s activity tended to reduce his neighbors’ property values. Here, the neighbors are not in any way adversely affected by keeping plaintiff’s property zoned as it was. Clearly the village did go too far in violating plaintiff’s rights “ in the name of aesthetics ” (see People v. Stover, supra).
Some of the other reasons that the village advances are:
“ b. The self-contained nature of the subject property for a separate zoning category;
1 ‘ c. The ability of this parcel * * * to create its own environment ;
“ d. The diminishing availability of waterfront parcels;
“ e. The probable future development of the village and its impact on roads, recreation facilities, sanitation facilities, business development, water supply and schools;
*611 1 ‘ f. The unavailability within the village of lands available for lower density;
“ g. The developability of the land in question under one-acre zoning ’ \
I cannot see, nor does the village show, how Items b, c, d, f and g support its desire and anxiety to up-zone plaintiff’s property to 40,000 square feet, to plaintiff’s property value loss of 58%. The best the village’s argument seems to be is that it has the absolute right to create a self-contained island of minimal 40,000 square-foot estates in a sea of 5,000, .7,500 and 15,000 square-foot residential plots. I do not see, and the village fails to show, how all this is advantageous to the general welfare of the community.
Item e (impact on roads, recreation, water, schools, etc.) would make no substantial difference on the village’s development since the village expert admitted that keeping the area zoned at 15,000 square feet would add onlv 277 persons to a community of 9,000.
It is clear to me that the village’s up-zoning of the plaintiff’s property was not made in accordance with a comprehensive plan, nor designed to further any of the purposes set forth in section 177 of the Village Law; that is, it was not designed to lessen congestion in the streets, or to secure safety from fire, flood, panic and other dangers, or to promote health and the general "welfare, or to provide light and air, or to prevent overcrowding of the land, or to avoid undue concentration of population, or to facilitate the adequate provision of transportation of water, sewerage, schools, parks and other public requirements. It seems designed to unreasonably create an estate island in a sea of small residential properties for the mere aesthetic benefit of a few adjacent neighbors.
I am satisfied beyond a reasonable doubt that the October 16, 1964 ordinance reduced the value of plaintiff’s property to 42% and made it impossible to develop the property with a fair return in less than 20 years, that it was not enacted in accordance with any comprehensive plan, and that it was not designed to further the purposes for which zoning ordinances may be enacted.
I am convinced beyond a reasonable doubt that the up-zoning of plaintiff’s property from 15,000 square feet to 40,000 square feet was arbitrary, unreasonable and capricious and that it deprived plaintiff of her property without due process of law (Wiggins v. Town of Somers, 4 N Y 2d 215, 218). The up-zoning amendment in issue is therefore unconstitutional and invalid.